RECEIVED
SEP 19 2014
WILLIAM T. WALSH, CLERK
14-5835 (WJM)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Application of<br><br>Kate O'Keeffe<br><br>To Issue a Subpoena for the Taking of a Deposition and the Production of Documents for Use in a Foreign Proceeding | *EX PARTE* APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE A SUBPOENA TO KIRK A. THORELL FOR THE TAKING OF A DEPOSITION AND THE PRODUCTION OF DOCUMENTS FOR USE IN A FOREIGN PROCEEDING<br><br>Miscellaneous Case No. |

1.  Kate O'Keeffe (the "Applicant" or "O'Keeffe") applies to this Court for an Order, under 28 U.S.C. § 1782, and Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, granting Applicant leave to serve the subpoena attached as Annex A to the Declaration of Laura R. Handman, requiring Kirk A. Thorell ("Mr. Thorell") to produce documents and appear at a deposition. Applicant is a Hong Kong-based reporter who is employed by Dow Jones & Company, Inc. to write material for its publications, including the *Wall Street Journal*, the *Wall Street Journal Asia*, and the *Wall Street Journal Europe*. As explained below, Applicant, an interested party, seeks this evidence in aid of her defense against a libel claim filed by Sheldon G. Adelson currently pending against Applicant in Hong Kong, *Sheldon Gary Adelson and Kate O'Keeffe*, High Court of the Hong Kong Special Administrative Region (HCA 342/2013) (the "Hong Kong Lawsuit"), and asks this Court to grant such leave *ex parte*, or, in the alternative, that this Court enter an Order to Show Cause why the subpoena should not issue and order an accelerated briefing and hearing schedule.

2. The libel claim against the Applicant arises out of an article written by Ms. O'Keeffe and Alexandra Berzon, and published in the December 7, 2012 edition of the *Wall Street Journal*.[1] The article reports on a wrongful termination lawsuit filed by Steven Jacobs against his former employer, LVSC, and its Macau, China subsidiary, Sands China Ltd. ("SCL"). The article describes tensions that arose during Jacobs's employment between Jacobs and the Chairman of the Board and Chief Executive Officer of LVSC, Sheldon G. Adelson.

3. Mr. Adelson is one of the wealthiest men in America and in the world, with a personal fortune of approximately $32.5 to $33.1 billion, according to sources such as Forbes and Bloomberg. *See* Bloomberg Billionaires Index, http://www.bloomberg.com/billionaires/2014-08-08/cya (last visited Aug. 29, 2014) (No. 15); Forbes, "The World's Billionaires," http://www.forbes.com/billionaires/ (last visited Aug. 29, 2014) (No. 14). Adelson is also a frequent litigant who has brought numerous libel suits, including, most recently, a $60 million lawsuit against the National Jewish Democratic Council in the United States District Court for the Southern District of New York, dismissed with prejudice on September 30, 2013 (*Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013)), and a lawsuit against Jacobs in state court in Florida for a declaration filed in Jacobs's wrongful termination lawsuit (*Adelson v. Jacobs*, No. 12-28537 CA 24 (Fla. 11th Jud. Cir., filed July 20, 2012)) (the "Florida Lawsuit"), in which summary judgment was granted to Jacobs on February 24, 2014. Adelson is appealing both the *Adelson v. Harris* decision and the decision in the Florida Lawsuit.

---

[1] A copy of the article is attached to the Declaration of Laura R. Handman (hereinafter "Handman Decl.") as Exhibit A.

4. The *Wall Street Journal* article contained the following sentence: "In some ways, Mr. Jacobs, a 6-foot-5-inch tall Ivy League graduate who colleagues say rarely curses, couldn't be more different from Mr. Adelson – a scrappy, foul-mouthed billionaire from working-class Dorchester, Mass."

5. On February 22, 2013, Adelson filed the Hong Kong Lawsuit, a libel claim against O'Keeffe based upon the description of him in the December 7, 2012 article in the *Wall Street Journal* as "foul-mouthed."[2] Adelson alleges that the description of him as "foul-mouthed" is defamatory and untrue. Adelson claims in his Statement of Claim (March 1, 2013) that he is an "internationally renowned businessman, entrepreneur, and philanthropist" and the founder and chairman of LVSC and SCL, which are the largest and second-largest gaming companies by market capitalization in the world; that he and LVSC are well known worldwide; that the description of him as foul-mouthed "has caused him considerable distress and embarrassment;" that in the Article, he was "specifically and directly referred to in his office as Chairman" of SCL and LVSC; that "foul-mouthed" in the Article was meant and understood to mean that he used bad language "in his office as Chairman" of SCL and LVSC and "in business meetings when addressing colleagues and subordinates;" that "the allegation was made of [Adelson] not just personally but more damagingly of him in his office as Chairman of SCL and [LVSC];" and that the description of him as foul-mouthed "necessarily impact[s] upon both the reputation and standing of SCL and [LVSC] and their market capitalizations." Statement of Claim ¶¶ 1, 2, 5, 6, 13, 15-18.

---

[2] *Sheldon Gary Adelson and Kate O'Keeffe*, Statement of Claim (hereinafter "Statement of Claim") is attached to the Handman Decl. as Exhibit B.

3

6.  In his Statement of Claim, Adelson defined "foul-mouthed" as meaning that he used language that was "obscene, profane, or scurrilous"; "abusive, blasphemous, coarse and offensive"; and/or "rude and lewd." *Id.* ¶ 15.

7.  In her Amended Defence,[3] O'Keeffe defined "foul-mouthed" as meaning and intending to mean "only that [Adelson] had a tendency to use offensive, bad and/or coarse language." Amended Defence ¶ 13.

8.  As used throughout and solely for purpose of this Application and Subpoena, the phrase "foul or otherwise offensive language" shall mean: foul, obscene, profane, scurrilous, abusive, blasphemous, coarse, offensive, rude, lewd, or bad language.

9.  The subpoena sought by O'Keeffe is reasonably calculated to lead to the discovery of evidence relevant to and for use in the defense of the libel claim against O'Keeffe. As outlined in O'Keeffe's Amended Defence, O'Keeffe contends that the term "foul-mouthed" is "true in substance and fact," and gives several examples of Adelson's use of foul or otherwise "offensive language," based in part on published reports and public records, including

    - In 1999, the Plaintiff was verbally abusive to Temple Beth Sholom synagogue Rabbi Felipe Goodman in the latter's office in Las Vegas, following the synagogue's decision to hold a fundraiser at The Four Seasons rather than at the Plaintiff's own resort, The Venetian.

    - During a telephone call in December 2001, the Plaintiff swore at Richard Suen, a Hong Kong business man, referring to Mr. Suen in the following manner (or words to very similar effect): "*I never met someone who was so fucking bitter. You don't know shit about the financing of the business. I need this fucking Taiwanese because I need the money.*" [Emphasis added]

---

[3] The Amended Defence was the subject of an application to amend, brought by summons dated August 14, 2013, and decided by the Hong Kong court on August 12, 2014. A copy of the Amended Defence, as filed on September 3, 2014 pursuant to the Hong Kong Court's ruling, is attached to the Handman Decl. as Exhibit C.

4

- In or around spring 2002, during dinner at the Chinese restaurant at The Regent Hong Kong - then a hotel in Kowloon - in the context of discussing litigation proceedings against him or LVS in Las Vegas, the Plaintiff said the following (or words very similar): "*Can you change the fucking judge? He's nothing but a fucking pain in the ass.*" [Emphasis added]

- During the filming of the documentary "King of the Strip" produced by the British Broadcasting Corporation and The Learning Channel, and featuring the construction and subsequent opening in May 1999 of The Venetian (Las Vegas), the Plaintiff, knowing that he was being filmed and that his behaviour and what he said could be broadcast on television, said the following to a contractor in the context of discussing the colour of the windows: "*I'm going to get God damn upset at you*". The word "God" was bleeped out.

- The Plaintiff launched an abusive tirade against his former security staff and personal driver, Kwame Luangisa, in or around March 2011, which (inter alia) caused Mr. Luangisa to resign on 25 March 2011.

- During a US court deposition taken by law firm Campbell & Williams in 2006, the Plaintiff was discourteous, rude and arrogant.

- During a deposition given by the Plaintiff in the US Lawsuits (Florida) on 23 October 2012, the Plaintiff, while listing things he said could potentially hurt his reputation, said the following: "*Murder, rape, dismembering, punching wise-ass attorneys in the face, all of that might hurt my reputation. Might.*" [Emphasis added]

- During a meeting with Mr. Jacobs (which took place prior to Mr. Jacobs' termination in July 2010), Mr. Jacobs reported to the Plaintiff the outcome of a meeting that Mr. Jacobs had had with Macau's then-Chief Executive, Edmund Ho, and told the Plaintiff that the then-Chief Executive would not take any actions to enable the proceeds of a sale of SCL's "Four Seasons" apartments to be included in SCL's valuation for the purpose of SCL's public listing. The Plaintiff replied saying that Chief Executive Ho had "*promised*" him Strata-Title [required to attribute the sale proceeds to SCL's valuation] and that Chief Executive Ho was reneging on his "*promise*". The Plaintiff then asked Mr. Jacobs to convey a message to

> Chief Executive Ho, referring to him as a "*son of a bitch*",
> that the Plaintiff had settled a lawsuit paying $40 million
> dollars to keep Chief Executive Ho out of jail and that
> Chief Executive Ho owed Adelson Strata-Title as a result.

Amended Defence, Handman Decl., Ex. C at 4-6. Evidence establishing the truth of O'Keeffe's description of Adelson as "foul-mouthed" is a central issue in dispute in this case.

10. Kirk A. Thorell is a partner with PricewaterhouseCoopers LLP ("PwC"). For twenty-five years, until April 2013, PwC was the auditor for LVSC. The *Wall Street Journal* has reported that "personal tension" between Adelson and PwC played a role in PwC's decision to resign as LVSC's auditor, as did Adelson's "challenging demeanor and demands on the auditors."[4] Applicant seeks the documents and testimony described in the attached Subpoena and Schedules A and B and Attachment A annexed thereto (which are incorporated by reference in this motion), including, but not limited to, information regarding his interactions with Adelson in the context of PwC's representation of LVSC, and Adelson's demeanor.

11. Mr. Thorell's testimony and documents regarding his interactions with Adelson will shed light on Adelson's tendency to use foul or otherwise offensive language.

12. The Applicant has not been able to obtain the requested discovery using informal channels, and so is left with little choice but to seek judicial assistance of this Court under 28 U.S.C. § 1782.

13. This application meets the statutory requirements of § 1782, which provides as follows:

> (a) The district court of the district in which a person resides or is
> found may order him to give his testimony or statement or to produce
> a document or other thing for use in a proceeding in a foreign or

---

[4] "Sands Casino Says Auditor Quits Account," Alexandra Berzon and Michael Rapoport, *Wall Street Journal*, April 26, 2013 (attached to the Handman Decl. as Exhibit D).

6

> international tribunal, including criminal investigations conducted before formal accusation. The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782 (2006). As stated by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246-47 (2004), to obtain discovery, the applicant must make a threshold showing that:

> (1) the person from whom the discovery is sought either "resides" or is "found" in this District;
>
> (2) the discovery is "for use in a proceeding" before a "foreign tribunal"; and
>
> (3) the applicant qualifies as an "interested person."

*Id.* The application filed by O'Keeffe meets all of the requirements of 28 U.S.C. § 1782.

14. Upon information and belief, Mr. Thorell works in PwC's office in Florham Park, New Jersey. He is, therefore, "found" in this judicial district for purposes of § 1782 by force of his employment in Florham Park, New Jersey.

15. The discovery sought is for use in the defense of the libel claim brought by Mr. Adelson, a civil proceeding currently pending in Hong Kong against the Applicant. The Hong Kong court entertaining the civil proceeding clearly qualifies as a foreign tribunal. Section 1782 previously has been applied to authorize discovery for matters pending in the Hong Kong courts. *See In re Application of Esses*, 101 F.3d 873 (2d Cir. 1996); *In re Mak*, 2012 WL 2906761 (N.D. Cal. July 16, 2012); *see also In re Summit Global Logistics, Inc.*, 2009 WL 1025104 (Bkrtcy.D.N.J.,2009) (stating in dicta that Section 1782 should be applied in case of parallel proceeding in Hong Kong, but declining to decide because no application under Section 1782 had been made).

7

16. As the defendant in the foreign civil proceeding, the Applicant qualifies as an "interested person" within the meaning of § 1782. "An interested person includes a party to the foreign litigation, whether directly or indirectly involved." *In re Merck & Co.*, 197 F.R.D. 267 (M.D.N.C. 2000), citing *Lancaster Factoring Co. v. Mangone*, 90 F.3d 38 (2d Cir. 1996)

17. Once the statutory requirements of § 1782 are met, "[t]he permissive language of section 1782 vests district courts with discretion to grant, limit, or deny discovery." *Bayer AG, v. Betachem, Inc.*, 173 F.3d 188, 191 (3rd Cir. 1999) (citation omitted); *see also In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 80 (2d Cir. 1997) ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright.") (citation omitted).

18. In *Intel Corp.*, the Supreme Court set forth the factors that may inform the district court's discretion in deciding to grant a § 1782 application. A court need not consider all of these factors in making its decision on the application, but may use them as guides in its decision-making. The discretionary factors that may be considered are as follows:

> (1) whether the persons from whom the discovery is being sought are participants in the foreign proceeding;
>
> (2) the nature and character of the foreign proceeding and the receptivity of the foreign tribunal to U.S. federal judicial assistance;
>
> (3) whether the request is an attempt to circumvent foreign proof gathering limitations; and
>
> (4) whether the discovery sought is unduly burdensome.

*Id.* at 264-65.

19. Each of the *Intel Corp.* discretionary factors is met here in Applicant's request for judicial assistance:

- Neither Mr. Thorell nor PwC is a party to the civil proceedings in Hong Kong, and his evidence is, therefore, unavailable in that proceeding without this Court's assistance. *Intel Corp.*, 542 U.S. at 264 ("[N]onparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid.").

- The nature and character of the proceedings in Hong Kong warrant the Court's assistance, *Intel Corp.*, 542 U.S. at 264. The libel claim is brought against the author of an article in the *Wall Street Journal* reporting on a matter of significant public import: the business dealings of one of the world's most wealthy and prominent business executives, with major gaming businesses in both Las Vegas, Nevada and Macau, China. "[I]t is sufficient that the applicant intend to offer the evidence to a foreign court. Whether the foreign court will ultimately accept the evidence is beyond the [U.S.] Court's ability to determine." *In re Imanagement Servs. Ltd.*, 2006 U.S. Dist. LEXIS 8876, at *8 (D.N.J. Feb. 28, 2006). Section 1782 contains no "foreign-discoverability" prerequisite. *Intel Corp.*, 542 U.S. at 259-64.

- The application is not a bad faith attempt to circumvent proof-gathering restrictions in the foreign proceedings, but rather is a good faith effort to secure relevant evidence that is beyond the jurisdiction of the foreign court.

- The discovery requests are not unduly intrusive or burdensome, since the subjects of inquiry are limited to Mr. Thorell's encounters with Adelson and Adelson's demeanor and use of foul or otherwise offensive language. Accordingly, any legitimate concerns Mr. Thorell or PwC have regarding production of confidential commercial information, trade secrets, or privileged information may be addressed through appropriate redaction of such material other than evidence related to Adelson's "challenging demeanor" or use of foul or otherwise offensive language.

20. Accordingly, O'Keeffe respectfully requests that her Application under 28 U.S.C. § 1782 be granted and that Applicant be authorized to serve the subpoena attached as Annex A to the Declaration of Laura R. Handman, which is attached to this Application.

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

_____
Robert D. Balin
Camille Calman (*Pro Hac Vice* Admission Pending)
1633 Broadway, 27th Floor
New York, NY  10019
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8230
Email:  robertdbalin@dwt.com
Email:  camillecalman@dwt.com

Laura R. Handman (*Pro Hac Vice* Admission Pending)
constance M. Pendleton (*Pro Hac Vice* Admission Pending)
1919 Pennsylvania Avenue, NW, 8th Floor
Washington, D.C. 20006
Telephone:  (202) 973-4224
Facsimile:  (202) 973-4499
Email: laurahandman@dwt.com

                                  Email: conniependleton@dwt.com

                                  *Attorneys for Applicant*
                                  *Kate O'Keeffe*

Dated:  September 18, 2014